Filed 11/30/15  City of Milpitas v. City of San Jose CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| CITY OF MILPITAS, | H040664 |
| Plaintiff and Appellant, | (Santa Clara County Super. Ct. No. 1-12-CV-233069) |
| v. | |
| CITY OF SAN JOSE, | |
| Defendant and Respondent, | |
| REPUBLIC SERVICES, INC. et al., | |
| Real Parties in Interest and Respondents. | |

The owners and operators of the Newby Island Sanitary Landfill and The Recyclery sought to increase the maximum height and capacity of their landfill, located within respondent City of San Jose and near appellant City of Milpitas.[1]  San Jose prepared an environmental impact report (EIR) under the California Environmental Quality Act (CEQA)[2] to assess the impacts of rezoning the property to increase the landfill's maximum permitted height and authorize uses that were unauthorized by the then-existing zoning.  Milpitas challenged the San Jose City Council's certification of

_____

[1]  The owners and operators are real parties in interest Republic Services, Inc., International Disposal Corporation of California, Browning-Ferris Industries of California, Allied Waste Industries, Inc., Los Esteros Ranch, LLC, and Gil Cheso (collectively, applicants).

[2]  CEQA is codified at Public Resources Code section 21000 et seq.  Unspecified statutory references are to the Public Resources Code.

that final EIR by petition for writ of mandate, which the trial court denied.[3]  For the reasons stated here, we will affirm the trial court's judgment.

## I.     CITY AND TRIAL COURT PROCEEDINGS

The Newby Island Sanitary Landfill and The Recyclery operate on two adjacent parcels but is separated into three geographic areas for discussion in the draft EIR.  The largest area is the landfill area, consisting of close to 300 acres.  The landfill has been accepting municipal waste since the 1930's.  Structures and uses on the landfill area before certification of the final EIR included: a lined sanitary landfill; open-air composting; scales for weighing incoming materials; a facility that collects landfill gas to generate electricity, operated by Gas Recovery Systems, Inc. (GRS facility); one of the two landfill gas flares operating as a back-up to the GRS facility; administrative offices; a construction and demolition recycling area; a landfill maintenance shop with a fueling station; stormwater detention ponds; and a leachate management system to collect liquids that drain from the landfill.  Waste delivered to the landfill is processed and deposited at its "working face," which was "generally located in the southwest quadrant of the landfill" when the draft EIR was prepared.  Once deposited at the working face, that waste is covered by soil or other materials.  Those activities were consistent with that area's San Jose General Plan land use designation, Private Open Space with a Solid Waste Landfill Overlay.  However, they were legal non-conforming uses with respect to zoning, having existed since the property was annexed by San Jose in 1968.  The landfill area was zoned as a Multiple Residence District.

Though part of the same legal parcel as the landfill area, a 17-acre flat portion of that parcel is described in the draft EIR as the D-shaped area because it is "visually

---

[3]  San Jose prepared a draft EIR for the project in 2009, followed by a First Amendment to the Draft EIR (Amendment) in 2012, which contained additions and revisions to the draft EIR as well as responses to public comments.  References to final EIR in this opinion are to the final text of the environmental document, either as it appeared in the draft EIR or as amended and supplemented by the Amendment.

2

distinctive and generally separated from most of the landfill." The D-shaped area occupies the easternmost portion of the parcel, has a General Plan designation of Light Industrial, and was zoned as a Multiple Residence District. The D-shaped area was permitted to receive landfill waste, but before final EIR certification the area was used only for temporary trailers and parking for a waste management hauling company as well as one of the GRS facility's back-up flares. The Recyclery is located just south of the D-shaped area on a 10-acre parcel used for recycling; outdoor processing of green, food, and wood waste; and temporary structures for hauling company offices and vehicle maintenance. It has a General Plan designation of Public/Quasi-Public and is zoned A(PD) – Planned Development Zoning District.

The Don Edwards San Francisco Bay National Wildlife Refuge surrounds the southwest, west, and northwest borders of the landfill area. The San Jose/Santa Clara Water Pollution Control Plant is immediately south of the landfill area and Recyclery. Property immediately east of the D-shaped area contains restored wetlands, with light industrial and commercial uses beyond the wetlands area. The nearest residential uses are .4 miles east of the D-shaped area and are within the City of Milpitas. The residential uses are separated from the landfill area, D-shaped area, and Recyclery by Interstate 880.

## A. THE PROJECT

In 2009, San Jose prepared a draft EIR to analyze the environmental effects of the applicants' proposal to: (1) increase the maximum top elevation of the landfill from 150 feet to 245 feet, which would increase the landfill's capacity by 15.12 million cubic yards; and (2) rezone the landfill area, D-shaped area, and Recyclery to conform with existing and proposed uses. The draft EIR lists the applicants' primary project objectives as: "A. Optimize use of the permitted footprint of the landfill for disposal capacity; [¶] B. Increase the height of the landfill to increase its disposal capacity to allow the landfill to continue to accept historic waste volumes from the region. No change is proposed to the landfill's estimated [2025] closure date ... ; [¶] C. Enable the project site to continue

3

to provide nearby waste disposal and recycling solutions for the City of San Jose and surrounding municipalities, thereby avoiding the environmental impacts that would be associated with trucking solid waste to more distant facilities; [¶] D. Create a comprehensive zoning district that recognizes and allows for the existing landfill, recycling, and waste diversion activities with flexibility to allow for future technologies/innovations to be used on the site; and [¶] E. Produce additional landfill gas for use as a renewable energy source for power generation by the on-site power plant." (Footnote omitted.)

The draft EIR states that the "project proposes to rezone the entire site ... to *A(PD)- Planned Development*, with the new planned development zoning including the current landfill and related operations and practices; increas[e] the permitted top elevation of the landfill from 150 to 245 feet ... ; add[] to and modify[] some of the uses allowed at the Recyclery ... ; and chang[e] the existing and previously approved uses of the D-shaped area to a specific group of uses related to the landfill and Recyclery operations, and a waste hauling business." The project description summarizes existing conditions on each of the three project areas, provides examples of proposed activities that would be allowed by the proposed PD rezoning, and includes a table showing the uses that would be permitted on each area under the rezoning.

The proposed rezoning would allow the existing hauling company office trailers and parking lot to continue operating on the D-shaped area and would authorize additional uses. According to the draft EIR, as the landfill expands to a larger footprint on the landfill area, the four landfill scales "will need to be moved east, closer to the site entrance" and "may be located on the D-shaped area" depending on the final configuration of the property. Likewise, the GRS facility will need to be "relocated to the D-shaped area or elsewhere on the landfill" area as the landfill expands. In addition to relocation, the GRS facility might be expanded in the future to capture more landfill gas. The maintenance shops and appurtenant diesel fueling station currently on the

4

landfill area "may be relocated onto a different part of the landfill footprint or to the D-shaped area when landfill phasing requires that waste be disposed at their current location." Finally, the leachate holding tanks may be relocated from the landfill area to the D-shaped area. A conceptual site plan with lists of proposed uses on each of the three geographical areas suggests that the foregoing uses will eventually be located on the D-shaped area. Before adding uses to the D-shaped area, the draft EIR states that San Jose "will need to review and approve a Planned Development Permit that identifies the specific design, building configuration, uses, and operations for the property within the parameters of this approved PD zoning."

The draft EIR states that many of the uses proposed as part of the rezoning "would require subsequent environmental review because specific details" about their construction and operation are presently unknown. Uses requiring future environmental review include, as relevant here, construction of buildings or structures and expansion of the GRS facility. The draft EIR does not expressly state that the mere relocation of the GRS facility (or any other existing uses) onto the D-shaped area would trigger the need for further environmental review.

The draft EIR identifies three baselines against which impacts from the project would be measured: "(a) existing conditions (as they are today on the ground, including proposed changes to existing operations), (b) existing conditions if the landfill continues to operate as it does today and would likely reach capacity in 2016 as a result, and (c) existing conditions if the landfill only takes in contractual waste and would likely reach capacity in 2025 as a result." The phrase "including proposed changes to existing operations" is not defined or explained.

### B. IMPACTS ANALYSIS

We summarize only the impacts in categories relevant to this appeal.

## 1. Light and Glare Impacts

Regarding light and glare impacts, the draft EIR states: "The location of a corporation yard on the D-shaped [area] would likely require some additional nighttime lighting for safety purposes, and when equipment or vehicles are being serviced between the daytime shifts. This is not a change from existing conditions (since most of the corporation yard operations are already on the site) but would be different compared to circumstances if the operations are not allowed on site." The draft EIR assumes that any new lighting will be "shielded and directed downward during night operations" and that lighting attached to any permanent vehicle maintenance building (an element of the corporation yard) would be subject to San Jose's Outdoor Lighting Policy and Riparian Corridor Policy Design Guidelines. For those reasons, the draft EIR concludes the project would have less than significant light and glare impacts.

## 2. Noise Impacts

According to the draft EIR, the project site's ground level is relatively quiet. On the working face of the landfill, noise primarily comes from haul vehicles delivering waste. On the eastern portion of the property, "the prevailing noise is from I-880 and trucks entering the site." Given the proximity of the property to Interstate 880, operational noise "is not specifically noticeable off-site" even when multiple pieces of equipment are operating. The "largest single noise source" is the electric generator at the GRS facility, located on the eastern portion of the landfill area, approximately 2,800 feet west of the entrance to the property. Measurements from June 2008 at an intersection near the entrance to the property showed noise levels ranging "from less than 55 dBA DNL to less than 70 dBA DNL."[4] San Jose's General Plan requires noise levels for industrial uses like the landfill and Recyclery to be 70 dBA DNL or lower. Under

---

[4] According to the draft EIR, DNL "stands for Day-Night Level and is a 24-hour average of noise levels, with 10 dB penalties applied to noise occurring between 10:00 p.m. and 7:00 a.m."

existing conditions the draft EIR states that "landfill noise is not perceptible at the [nearest] residential property due to the intervening freeway interchange, and complaints have not been received from local residents regarding noise problems."

The draft EIR states that the project proposes to allow relocation of existing uses and possible construction of permanent buildings to replace temporary trailers. For impacts related to temporary relocation and construction noises, the draft EIR states that specific information about operations and physical changes "are unknown at this time" but that temporary increases in noise would probably "not be distinguishable from the existing noise generated by I-880," which is located between the project site and the nearest residence. As for impacts related to operational noise under the project, the draft EIR states that "[i]ndividually significant noise generators have not been identified as part of any changes proposed," but that ambient noise levels are expected to increase incrementally with the addition of uses that are not currently permitted. Despite those incremental increases, the draft EIR concludes that noise levels in the project area "are not anticipated to substantially increase." The Amendment added a new paragraph to the operational noise impact analysis to cross-reference a biological impact mitigation measure, noting that "as part of the project, no new activities that would generate substantially greater noise or vibration compared to existing conditions would be allowed within the 700 feet of California clapper rail nesting habitat" surrounding the property. That 700-foot buffer zone is depicted in Figure 1.0-9 of the draft EIR and encompasses the entire D-shaped area, as well as substantial portions of the landfill area. The Amendment concludes that "the noise generated on a daily basis would remain the same as under existing conditions," meaning that the project would not result in significant noise impacts.

### 3. Air Quality and Odor Impacts

The draft EIR's air quality analysis separates its discussion into air emissions and odor emissions. Regarding air emissions, the draft estimated the amount of various

criteria air pollutants (pollutants regulated by the federal Clean Air Act (42 U.S.C. § 7401 et seq.)) that would be released under four scenarios: (1) emissions from the applicants' existing use of the site; (2) emissions if the landfill closed immediately; (3) emissions if the landfill continued operating until it reached its permitted maximum capacity; and (4) emissions if the project is approved. Because the project would increase emissions of two criteria air pollutants (nitrogen oxides and volatile organic compounds) above thresholds established by the Bay Area Air Quality Management District (the District), the applicants would need to purchase offsets for any emissions above those thresholds. Though emissions of sulfur oxides would increase from 29.91 tons per year to 42.18 tons per year because of the project, the draft EIR did not find any mitigation measures necessary because the increase would not exceed any thresholds established by the District for that pollutant.

The Amendment elaborated on the draft EIR's analysis of odor impacts based on an odor assessment attached as an appendix to the draft EIR. The Amendment provided a history of odor issues in the region, noting that in October 2003 the Milpitas City Council held a public hearing to identify potential sources of chronic odor complaints by Milpitas residents. In addition to the landfill at issue here, other possible odor generators included the Milpitas sewage collection system, the San Jose/Santa Clara Water Pollution Control Plant, another landfill facility, and the San Francisco Bay. Following that hearing, an Odor Action Plan was developed to centralize complaints, provide timely notification of complaints to odor generators, and establish best management practices tailored to each odor generator.

The Amendment states that "municipal solid waste"[5] handled by the landfill and food waste handled at the Recyclery are the sources of the "greatest odor generating

_____

[5] The draft EIR defines municipal solid waste as "all kitchen and table food waste, and animal or vegetable waste that attends or results from the storage, preparation, cooking or handling of food stuffs."

8

potential" from existing operations. Municipal solid waste can ferment and produce concentrated odor at the active face of the landfill. Construction and demolition material such as dry wall "can degrade in the landfill and form hydrogen sulfide in the landfill gas, which smells like rotten eggs." The Amendment also identifies green waste composting as a process that can produce odors. All of those "odoriferous compounds can escape from the landfill surface through cracks in the surface cover." Between 2005 and 2008, the District received 155 odor complaints about the landfill but only three complaints were confirmed. The applicants follow an Odor Impact Minimization Plan, which contains a protocol for responding to citizen complaints about odor. That protocol includes logging the complaint, implementing one or more odor control measures, and contacting the complaining party after corrective action is taken to determine whether the action was effective. The Amendment lists odor control measures. On the landfill area, those measures include using the GRS landfill gas collection and control system and covering loads that could emit odors. On the Recyclery, odor control measures include processing feedstock, green waste, and food waste within 48 hours; routinely turning compost "to maximize porosity and thorough composting"; and processing malodorous materials within 24 hours.

The Amendment notes that the District's CEQA guidelines mandate that landfills proposed within one mile of sensitive receptors (including residential uses) must undertake detailed analysis of potential odor impacts. The Amendment states that the District's guidelines do not set a precise threshold of significance for locating a new odor source near existing receptors. Under the project, though the working face of the landfill would not increase, the landfill would expand vertically. The Amendment states that the landfill's vertical expansion "would result in an increased capacity and increased landfill gas emissions." The Amendment does not explain why landfill gas emissions would increase. But when describing existing conditions, the Amendment notes that odiferous compounds can escape from landfill areas other than the working face through cracks in

9

the surface cover. The Amendment likely assumes that the increased surface area caused by the vertical expansion would provide more areas from which those compounds could escape. The Amendment states that the increased profile would also expose a greater surface area of the landfill to wind. Although the distance odors would have to travel to reach receptors and the possibility for dispersal into the air would increase, dilution by distance and dispersal "would not sufficiently reduce the concentration of odiferous compounds to undetectable levels" and receptors in Milpitas would probably continue to be affected. To mitigate those effects, the Amendment added an Initial Compost Area Line, a boundary line mandating that composting activities occur only on the western portion of the landfill, which is the area farthest from Milpitas. The Amendment concludes that through implementation of the Initial Compost Area Line and continued adherence to the odor control measures and Odor Impact Minimization Plan, the proposed project would not increase odors compared to existing conditions.

## C. ALTERNATIVES ANALYSIS

The draft EIR analyzed three alternatives: no project; alternative location (expansion of Kirby Canyon Landfill located elsewhere in San Jose and owned by Waste Management); and reducing the working face of the existing landfill to reduce access to food by gulls. The draft EIR concluded that none of the alternatives would meet all of the applicants' project objectives and indicated that the reduced gull access alternative and location alternative would be environmentally superior to the proposed project because both would reduce the impact of gulls on biological resources.

Under the location alternative, the Kirby Canyon Landfill would be expanded by 15.12 million cubic yards. The alternative location would reduce the project's impacts to biological resources because the Kirby Canyon Landfill is not located near San Francisco Bay, such that "the secondary effects of gull predation would be much less" than the effects from the project. However, expanding the Kirby Canyon Landfill would likely result in significant impacts to different endangered species located near that landfill.

10

The draft EIR states that the location alternative's effects would be similar to those of the proposed project in land use, air quality, geology and soils, hydrology and water quality, hazards and hazardous materials, cultural resources, utilities and service systems, energy, traffic, and noise. Visual impacts might be significant if the increased capacity required Kirby Canyon Landfill to increase its maximum height. The location alternative would meet two of the five project objectives: providing a landfill and recycling facility close to San Jose and surrounding municipalities, and producing renewable energy from landfill gas. However, it would not meet the other project objectives of optimizing the use of the project site for disposal capacity; increasing the height of the landfill to allow it to continue accepting historic waste volumes; and creating a comprehensive zoning district to bring the landfill and Recyclery into compliance with San Jose's zoning.

### D. EIR CERTIFICATION AND PETITION FOR WRIT OF MANDATE

Milpitas was among the entities that submitted comments on the draft EIR, with Milpitas's comments at that stage focusing on the project's odor impacts. After San Jose released the Amendment and scheduled a Planning Commission meeting to certify the final EIR, Milpitas submitted three additional comment letters. The new letters elaborated on Milpitas's former comments about the project's odor impacts and also argued that the final EIR's analysis was deficient regarding the following issues: the project description and baseline assumptions; the noise and light impacts of relocating uses such as the GRS facility to the D-shaped area; and the alternatives analysis. Milpitas also submitted a report by an odor expert that focused on odor impacts of composting activities and recommended an enclosed composting system.

After a hearing in June 2012, the San Jose Planning Commission voted to recommend that the City Council certify the final EIR for the project. In its transmittal memorandum to the City Council, the Planning Commission advised the City Council that certification of the final EIR and approval of the planned development rezoning would allow the applicants "to move forward with subsequent Planned Development

11

Permits to effectuate the zoning district, allow continued landfilling and waste diversion activities, and further environmental mitigation measures."

In proceedings before the City Council, council staff prepared a staff report responding to Milpitas's argument that the final EIR did not adequately address the impacts of relocating uses from the landfill to the D-shaped area. The report stated that although the final EIR lists uses that may be allowed on the D-shaped area in the future, because of the landfill's age and ongoing regulatory changes related to landfills, "it is impossible to forecast precisely which (if any) operations will need to continue without change, which will need to expand, and which will be eliminated ... ." The report noted that converting the temporary hauling company trailers on the D-shaped area to permanent structures "would require additional CEQA review prior to approval of a PD Permit ... ." For all uses proposed for the D-shaped area, the report indicated that "all uses moved to the D-shaped area or the Recyclery site will be restricted to noise and vibration levels no greater than currently exist at those locations." The report further specified that the "GRS facility might still be relocated to the D-shaped area, but only if it can provide substantial attenuation of its operating noise to a level no greater than the noise levels currently found on the D-shaped area." In response to Milpitas's other concerns, the report noted that the applicants would need to apply for PD permits for any new uses on the D-shaped area, including additional lighting and relocating the diesel fueling station.

At an August 2012 City Council meeting, the council received public comments, including comments by an attorney for Milpitas. San Jose's director of planning, building, and code enforcement responded to comments that the final EIR provided inadequate analysis of relocating uses to the D-shaped area, noting that staff "did not see the need to provide a noise analysis of uses that may or may not occur in the future" because of a 700-foot noise buffer biological mitigation measure. The director continued that if "at some point there is a proposal to put uses on the property, we would go

12

through ... the planned development permit process, do the specific noise and light, glare, vibration-type analysis at that point to ensure that" the new use complies with the 700-foot buffer standard. In response to a council member's request for clarification about whether the final EIR analyzed the environmental effects of relocating existing uses to the D-shaped area, an attorney from the San Jose city attorney's office stated that if the applicants propose to relocate uses onto the D-shaped area in the future, "it will require additional environmental review because [the D-shaped area] is within ... the 700-foot buffer" area. Later, that attorney further elaborated that "with regard to the D-shaped parcel, ... although we've acknowledged that uses could move around, that area is within the 700-foot buffer," and the final EIR "does not clear additional significant noises" in that area. The City Council certified the final EIR and approved the rezoning.

Milpitas challenged the City Council's certification by petition for writ of mandate. At the hearing on the petition, Milpitas argued that the final EIR did not adequately disclose or assess the effects of relocating uses to the D-shaped area and that if the trial court denied the petition the applicants could later prevent necessary environmental review of that relocation by reference to the deficient final EIR. The court asked counsel for San Jose whether someone "ten years from now is going to stand up and say: We did that back then and covered it" in the final EIR, to which counsel replied "No." Counsel for San Jose argued that the final EIR broadly discusses uses that would be allowed on the D-shaped parcel under the new zoning but that a PD permit "would be needed for any new use, any intensification of use, or any new building," and noted that PD permits are discretionary. As discretionary decisions, counsel argued those new PD permit applications would be subject to CEQA review. (See § 21080 [CEQA applies to "discretionary projects"]; Cal. Code Regs., tit. 14, § 15357 [defining "discretionary project" as "a project which requires the exercise of judgment or deliberation when the public agency or body decides to approve or disapprove a particular activity"].) Specifically regarding the GRS facility, counsel argued relocating that facility would

13

require a new building and the expansion of use, both of which would require CEQA review. Another attorney for San Jose noted that the final EIR assessed the environmental impacts of proposed changes generally, based on the information presently available, and committed San Jose to assessing the impacts of specific changes at a later time when detailed information regarding proposed relocated uses is available so that they "can be thoroughly vetted based on existing knowledge." The trial court denied Milpitas's petition by written order, finding that Milpitas had not exhausted their administrative remedies regarding its baseline and alternatives arguments, and that the final EIR's conclusions were supported by substantial evidence.

## II. DISCUSSION

On appeal from a trial court's denial of a petition for writ of mandate challenging an agency's compliance with CEQA, we review the administrative record to determine whether the agency abused its discretion. (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 116-117 (*Save Our Peninsula*); § 21168.) In doing so, we are not bound by the trial court's findings. (*Ibid.*) An abuse of discretion can be shown if the agency has not proceeded in the manner required by law or if the agency's decision is not supported by substantial evidence. (§ 21168.5.) As stated in the CEQA Guidelines,[6] substantial evidence includes "facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts" in the whole record before the lead agency from which a "fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Guidelines, § 15384, subds. (a), (b).) "Argument, speculation, unsubstantiated opinion or narrative, evidence which is clearly erroneous or inaccurate, or evidence of social or economic impacts which do not

---

[6] The CEQA Guidelines are found at California Code of Regulations, title 14, section 15000, et seq. Unspecified references to "Guidelines" are to the CEQA Guidelines.

14

contribute to or are not caused by physical impacts on the environment does not constitute substantial evidence." (*Id*. at subd. (a).)

We indulge all reasonable inferences and resolve all conflicts in the evidence in favor of certification. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 571 (*Western States Petroleum*).) As the project opponent, Milpitas bears the burden of proving the final EIR was legally inadequate. (*Save Our Peninsula, supra,* 87 Cal.App.4th at p. 117.) In order to exhaust administrative remedies, Milpitas (or another project opponent) was required to present the grounds for noncompliance with CEQA orally or in writing to the San Jose City Council before San Jose issued the notice of determination for the project. (§ 21177, subd. (a).)

## A. CEQA TIERING AND PROGRAM EIR'S

Milpitas argues that the final EIR did not adequately analyze the effects of relocating uses from the landfill area to the D-shaped area and that the deficiency was caused by San Jose's use of improper baseline assumptions.[7] San Jose argues that the final EIR is a first-tier program EIR, its impact analysis is adequately detailed for a first-tier level document, and more detailed environmental analysis will occur in the future through one or more second-tier environmental documents.

### 1. Tiering Projects Under CEQA

Tiered environmental review involves "the coverage of general matters and environmental effects in an environmental impact report prepared for a policy, plan, program or ordinance followed by narrower or site-specific environmental impact reports which incorporate by reference the discussion in any prior environmental impact report and which concentrate on the environmental effects which ... were not analyzed as significant effects on the environment in the prior environmental impact report." (§ 21068.5.) EIR's should be tiered "whenever feasible" to prevent duplicative analysis

---

[7] Milpitas exhausted its administrative remedies as to its challenge to the project baseline assumptions through a comment letter to San Jose's Planning Commission.

and focus on "issues ripe for decision at each level of environmental review ... ." (§ 21093, subds. (a), (b).) "A program EIR is an EIR which may be prepared on a series of actions that can be characterized as one large project and are related" by, among other things, geography or as "logical parts in the chain" of action. (Guidelines, § 15168, subd. (a)(1), (a)(2).) The Guidelines state that after a program EIR is certified, later activities are examined in light of the program EIR to determine whether additional environmental review is necessary. (Guidelines, § 15168, subd. (c).) A new initial study leading to either an EIR or negative declaration is required for effects on the environment that were not examined "at a sufficient level of detail" in the program EIR. (§ 21094, subd. (a)(1)(B); Guidelines, § 15168, subd. (c)(1).)

Though tiering is encouraged under CEQA, agencies must take care not to defer analysis of foreseeable project impacts. An "EIR must include an analysis of the environmental effects of future expansion or other action if: (1) it is a reasonably foreseeable consequence of the initial project; and (2) the future expansion or action will be significant in that it will likely change the scope or nature of the initial project or its environmental effects." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 396 (*Laurel Heights*).) That requirement prevents piecemealing of a large project into several smaller projects obscuring the cumulatively significant impacts of the project as whole. (*Ibid.*) If only limited information about future expansion is available, the program EIR need not include a "detailed environmental analysis of every precise use that may conceivably occur" but must "make informed judgments as to probable future activities" and broadly analyze the impacts of those activities. (*Laurel Heights,* at pp. 398–399; Guidelines, § 15144 ["Drafting an EIR ... involves some degree of forecasting ... [and] [w]hile foreseeing the unforeseeable is not possible, an agency must use its best efforts to find out and disclose all that it reasonably can."].)

16

## 2.  The Final EIR is a Valid Program EIR

Approving an ordinance to effect a comprehensive rezoning like the one here—
which establishes a new maximum landfill height and specifies uses allowed on each area
to bring the landfill and Recyclery parcels into conformance with San Jose's zoning—is
the type of project for which tiered CEQA review is appropriate.  (§ 21068.5; Guidelines,
§ 15168, subd. (a).)  A program EIR is the proper type of tiered CEQA document here
because the landfill area, D-shaped area, and Recyclery are related, both geographically
and as different elements of a unified landfill and recycling operation.  (Guidelines,
§ 15168, subd. (a)(1).)

The final EIR itself suggests it is a program-level document.  In the project
description, the final EIR states that there "are a number [of] uses proposed as part of this
rezoning that would require subsequent environmental review because specific details"
about their construction and operation were unknown.  It then lists several categories of
uses requiring further environmental review, including construction of buildings or
structures and expansion of the GRS facility.  As most future uses the final EIR identifies
for the D-shaped area fall within one of those two categories, the final EIR expressly
assumes further environmental review for those uses.[8]

### B.  ADEQUACY OF IMPACT ANALYSIS

Having determined that the final EIR is a program EIR, we address Milpitas's
arguments that the final EIR's light, noise, and odor analyses were inadequate, mindful
that a program EIR for "a comprehensive zoning ordinance ... should focus on the
secondary effects that can be expected to follow from the adoption ... but the EIR need
not be as detailed as an EIR on the specific construction projects that might follow."
(Guidelines, § 15146, subd. (b).)  Milpitas argues that the final EIR contains insufficient

---

[8]  We will address Milpitas's argument that the final EIR does not expressly state
that mere relocation of the GRS facility would require subsequent environmental review
when discussing noise impacts in Part II.B.2, *post.*

17

detail related to light and noise impacts because it relied on an improper baseline that incorporated changes proposed by the project into the baseline assumptions. Milpitas points to ambiguous language in the final EIR that the existing baseline includes "existing conditions (as they are today on the ground, *including proposed changes to existing operations*) ... ." (Italics added.) As we explain below, the final EIR began with a proper baseline consisting of the existing conditions on the ground in each of the three geographical areas; it then analyzed the environmental effects of the uses proposed by the rezoning on those areas at a first-tier level of detail.

### 1. Light Impact Analysis Is Adequate

The final EIR states that no changes to lighting or additional lighting are "proposed on the NISL." For purposes of the final EIR, the "NISL" refers to both the landfill area and the D-shaped area. While the final EIR acknowledges that placing a corporation yard on the D-shaped area "would likely require some additional nighttime lighting," it states that the addition "is not a change from existing conditions (since most of the corporation yard activities are already on the site) ... ." Further, the final EIR states that additional lighting would be subject to San Jose's Outdoor Lighting Policy and Riparian Corridor Policy Design Guidelines. Among other requirements, the policy and design guidelines would require low-sodium lighting, proper shielding to prevent light from aiming skyward, and design planning to ensure that lighting is "kept as far as possible away from the riparian corridor" so that light sources are not visible from riparian areas. Coyote Creek, which traces the northern border of the D-shaped area and the landfill before turning south and continuing to form the eastern border of the D-shaped area, is part of that riparian corridor.

Milpitas argues that even if most corporation yard activities are already on site, adding light is, by definition, a change to existing conditions. We agree that the final EIR's statement is inaccurate on that point but do not find that the misstatement dooms the final EIR's light impacts analysis. The final EIR is a program-level document that

18

expressly calls for further environmental review for many of the uses that will be allowed by the rezoning, including expansion of corporation yard activities. Currently, vehicle maintenance occurs on the Recyclery in temporary structures. Relocating vehicle maintenance into permanent structures on the D-shaped area would require construction, and further environmental review would be required by the terms of the final EIR. The structures will presumably comply with San Jose's lighting policy and design guidelines and potentially significant project-specific impacts can be identified and mitigated as part of later environmental review. Because the source of additional light identified in the final EIR will be subject to some level of further environmental review, substantial evidence supports the final EIR's finding of no significant light or glare impacts at the program level.

### 2. Noise Impact Analysis Is Adequate

The final EIR states that the project site as well as surrounding land uses are "relatively quiet," with noise "not specifically noticeable off-site" even when multiple pieces of machinery are operating "due to the relatively constant flow of vehicles on I-880." San Jose's General Plan sets 70 dBA DNL as the maximum allowable noise for industrial uses like those proposed to be allowed by the rezoning. The GRS facility's electricity generator is identified as the "largest single noise source," which is audible on the adjacent water pollution control plant south of the landfill. June 2008 noise measurements at the intersection of Dixon Landing Road and McCarthy Boulevard near the easternmost border of the D-shaped parcel "ranged from less than 55 dBA DNL to less than 70 dBA DNL." Under existing conditions, noise from the project site "is not perceptible" at the nearest residences .4 miles east of the project site in Milpitas "due to the intervening freeway interchange, and complaints have not been received from local residents regarding noise problems."

Regarding operational noise impacts of the project, the final EIR states "no new activities that would generate substantially greater noise or vibration compared to

19

existing conditions would be allowed" within the 700-foot California clapper rail nesting habitat buffer, which encompasses the entire D-shaped area and much of the landfill. The final EIR also states that although increasing the landfill height will increase the operational life (and therefore elongate the timeframe for noise generation), "the noise generated on a daily basis would remain the same as under existing conditions" and would therefore not result in significant new operational impacts.

Milpitas's argument focuses on impacts associated with relocating the GRS facility from its current position on the landfill area to the D-shaped area. Milpitas argues that the final EIR is deficient because it does not analyze the impacts of relocating the largest single noise source (the GRS facility) onto the D-shaped area, which would place it closer to residences in Milpitas. Milpitas notes that the final EIR mandates subsequent environmental review for expansion of the GRS facility but not necessarily for mere *relocation*. Further, because the GRS facility is currently within the 700-foot habitat buffer, Milpitas asserts that the final EIR appears to allow relocation of the facility to another area within that buffer because it would not be a "new" activity generating substantially greater noise.

Though the final EIR is susceptible of Milpitas's interpretation, San Jose has consistently interpreted the 700-foot buffer as an area-specific restriction, such that the buffer does not allow any new use on the D-shaped area substantially louder than uses presently on the D-shaped area. A staff report prepared for the City Council hearing regarding the final EIR states that the GRS facility might be relocated to the D-shaped area, "but only if it can provide substantial attenuation of its operating noise to a level no greater than the noise levels currently found on the D-shaped area." That report later reiterates that "all uses moved to the D-shaped area or the Recyclery site will be restricted to noise and vibration levels no greater than currently exist at those locations." Similarly, at the City Council hearing an attorney for San Jose confirmed that relocating the GRS facility to the D-shaped area "will require additional environmental review"

20

because the D-shaped area is within the 700-foot buffer. On appeal, the joint Respondent's Brief filed by San Jose and the applicants makes clear that if uses such as the GRS facility "are proposed to be moved to the D-shaped area or another part of the landfill, a PD Permit will be required and [the proposal] will be subject to review under CEQA."

As the lead agency, San Jose was the factfinder here and we must indulge reasonable inferences and resolve conflicting evidence in its favor. (*Western States Petroleum, supra,* 9 Cal.4th at p. 571.) San Jose interprets the 700-foot buffer to mean that no uses may be added to the D-shaped area that are substantially louder than existing conditions on the D-shaped area. Because San Jose's consistent interpretation of the 700-foot buffer language is reasonable, we defer to that interpretation and find that with the 700-foot buffer in place the final EIR's conclusion that the project will have no significant operational noise or vibration impacts is supported by substantial evidence. To the extent Milpitas also argues that the final EIR is deficient because it does not provide a baseline of existing noise conditions for use in determining whether new uses will be substantially louder, the measurement range of "less than 55 dBA DNL to less than 70 dBA DNL" at the intersection of Dixon Landing Road and McCarthy Boulevard provides a baseline for future environmental review.

### 3. Odor Impacts Analysis Is Adequate

The final EIR identifies raw municipal solid waste (including kitchen and green waste) as the substance from the landfill with the greatest odor generating potential and states that the following substances also produce odors: wallboard and dry wall; landfill gas; compost; and food waste processed at the Recyclery. Between 2005 and 2008, the Bay Area Air Quality Management District received 155 complaints about the landfill and three of those complaints were confirmed by that agency. The final EIR states that the landfill "averages approximately five odor related complaints a year from the residents of the City of Milpitas, none of which have resulted in violations." Existing

21

measures to control odor from the landfill include "the landfill gas collection and control systems, daily cover, water trucks, odor eliminating additives, meteorological stations, and proper maintenance of [composting] windrows."

As part of the environmental review process, a landfill expansion odor assessment was conducted, which was attached as an appendix to the draft EIR.  Based on that assessment, the final EIR acknowledges that increasing the landfill's height and capacity would cause increased landfill gas emissions and "expose a greater surface area of the landfill to meteorological conditions."  Those changes would make odorous compounds from the landfill more susceptible to being carried to sensitive receptors by the wind.  On the other hand, the increased height would increase the distance those compounds would have to travel to reach sensitive receptors and also increase the likelihood that some odors would disperse in the air before reaching those receptors.  Despite that dispersal, the final EIR states that "dilution would not sufficiently reduce the concentration of odiferous compounds to undetectable levels" and that Milpitas residents would continue to be affected by odors.

To counteract possible odor effects, the final EIR added a mitigation measure in the form of an Initial Compost Area Line, which limits composting activities to the western half of the landfill area in order to move that odor-causing activity farther from the Milpitas residences.  Any future proposal to move composting activities east of the line will require a PD permit and additional environmental review.  The final EIR also notes that the applicants will continue to implement the Odor Impact Minimization Plan and odor control measures (including gas collection through the GRS facility and covering odor-causing materials) to manage odors from the landfill.  The final EIR concludes that the project, including continuation of the Odor Impact Minimization Plan and odor control measures, and addition of the Initial Compost Area Line, "would not increase odors compared to existing conditions."

22

During hearings before the Planning Commission and City Council, Milpitas's comments largely focused on two issues: the inadequacy of the landfill's existing mitigation measures and the adverse odor effects of increased composting. Milpitas's odor expert opined that the open-air composting system used by the landfill creates "essentially uncontrolled" odor emissions and recommended an enclosed composting system. On appeal, Milpitas argues that the final EIR failed to follow District significance thresholds for odor, did not analyze whether increased landfill gas emissions would increase odors, and did not analyze whether existing mitigation measures (the Odor Impact Minimization Plan and odor control measures) are sufficient to mitigate the increased landfill gas emissions caused by the project.

Milpitas argues that the final EIR did not follow the District CEQA guidelines relating to odor. Those guidelines mandate odor impact analysis when a new source of odor is proposed near existing odor receptors and when a new receptor is proposed near an existing odor source. The guidelines do not specifically provide for situations where an existing odor source expands but, assuming the expansion qualifies as a new odor source, whether the project will cause significant odor effects would be determined "based on the distance and frequency at which odor complaints from the public have occurred in the vicinity of a similar facility." If a project will cause potentially significant odor impacts, District guidelines provide that mitigation measures should be imposed, including add-on controls or increased buffers between odor-causing activities and sensitive receptors. The guidelines identify buffer zones as "the most effective mitigation strategy" for preventing odor impacts.

Milpitas faults the final EIR for not identifying a " 'similar facilit[y]' " for comparing odor complaints and argues that the final EIR minimized the number of complaints reported against the existing landfill operations by focusing only on " 'confirmed' " odor complaints. But the final EIR appears to conclude that the project would cause potentially significant odor impacts because it identifies mitigation measures

23

to counteract those effects. Further, the mitigation measures proposed for the project are consistent with those recommended by the District CEQA guidelines: The GRS facility is an add-on control that collects landfill gas to produce energy; the Initial Compost Area Line is a buffer zone that restricts composting activities (the focus of Milpitas's comments at the administrative level) to the western portion of the landfill area to increase the distance between those activities and residences in Milpitas. Because the final EIR effectively treated odor impacts as potentially significant and identified mitigation measures to counteract those impacts, any deficiency in compliance with the District CEQA guidelines' threshold of significance was harmless.

Milpitas next argues that the final EIR, and the odor assessment upon which it was based, failed to analyze the odor impacts of increased landfill gas emissions such that the final EIR's conclusion that odors would not increase is unsupported by substantial evidence. Contrary to Milpitas's assertion, the final EIR expressly states that increasing the landfill height "would result in an increased capacity and increased landfill gas emissions." The final EIR analyzed the effects of those changes, concluding that they would increase both the possibility that odiferous compounds would be carried by the wind to receptors as well as the possibility that dispersal of those compounds in the air would actually decrease the intensity and concentration of odors. While the final EIR states that dilution would not make the odors "undetectable" and that "receptors in Milpitas would continue to be affected" by odors, CEQA does not mandate that environmental effects be mitigated to *undetectable* levels. This is particularly true when, as Milpitas made clear during the administrative proceedings, those effects are already detectable under existing conditions. (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 447 [environmental impacts of a project are "described and quantified" in relation to baseline conditions].) The expert report accompanying the final EIR concluded that continued implementation of existing mitigation measures and the mitigating aspect of the increased height of the landfill

24

would prevent odors from increasing over existing levels.[9] That expert conclusion, which is not contradicted by other expert evidence in the administrative record, provides substantial evidence to support the final EIR's conclusion of less than significant odor impacts. The Initial Compost Area Line, which was added after the odor assessment concluded that the project would have no significant odor impacts, provides further mitigation to prevent odors from adversely impacting receptors in Milpitas.

Finally, Milpitas uses figures from the air quality assessment to challenge the final EIR's finding of no significant odor impacts, noting for example that the project would increase emissions of potentially odorous volatile organic compounds and sulfur oxides. But Milpitas did not make arguments related to the odor impacts of those increased emissions during the administrative hearing process. They are therefore forfeited for failure to exhaust administrative remedies. (§ 21177, subd. (a); *Citizens Against Airport Pollution v. City of San Jose* (2014) 227 Cal.App.4th 788, 794 [exhaustion is a "jurisdictional prerequisite to CEQA action"].) Even assuming Milpitas had not forfeited those arguments, Milpitas provides no expert evidence to support its assertions on appeal, much less evidence of such an overwhelmingly substantial nature to disprove San Jose's evidence as a matter of law. (Guidelines, § 15384, subd. (a) ["Argument, speculation, unsubstantiated opinion or narrative ... does not constitute substantial evidence."]; see *In re I.W.* (2009) 180 Cal.App.4th 1517, 1528 ["[W]here the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law."].) The final EIR's odor impacts analysis acknowledges that the project will increase emissions of odor-causing compounds, but relies on an expert odor assessment to explain why odors will not

---

[9] San Jose asserts that the odor assessment suggests odor impacts would be "offset by expansion of the landfill gas collection and control system ... ." If that were the case, the EIR would have had to review the impacts of such an expansion. However, we read the odor assessment as discussing continuation of current landfill gas collection through the GRS facility rather than any expansion of that system.

increase above existing levels.  Substantial evidence thus supports the finding of no significant odor impact.

## C. ALTERNATIVES ANALYSIS

Milpitas argues that the final EIR's project objectives were drawn so narrowly that they precluded effective analysis of alternatives to the project.  Milpitas asserts that the objectives favored expansion of the present landfill to such a degree that the final EIR rejected a viable location alternative.

"An EIR shall describe a range of reasonable alternatives to the project, or to the location of the project, which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project, and evaluate the comparative merits of the alternatives."  (Guidelines, § 15126.6, subd. (a); *Laurel Heights, supra*, 47 Cal.3d at p. 406–408.)  However, an EIR need not consider "every conceivable alternative" to a project, nor must it consider alternatives that are infeasible.  (Guidelines, § 15126.6, subd. (a).)

Though the final EIR's objectives largely focus on expanding landfill operations at the current site rather than on satisfying San Jose's need for a landfill more generally, CEQA does not forbid drafting site-specific project objectives and we do not find the final EIR's objectives unduly narrow.  The final EIR's analysis of the location alternative demonstrates that the site-specific nature of the project objectives did not preclude effective review.

The final EIR assessed the feasibility of expanding the Kirby Canyon Landfill instead of expanding operations on the project site.  The Kirby Canyon location would reduce biological impacts related to gull predation, but the final EIR found that it would likely result in significant biological impacts to endangered species near the Kirby Canyon Landfill.  The location alternative would meet two of the five project objectives: providing a landfill and recycling facility close to San Jose and surrounding municipalities; and producing renewable energy from landfill gas.  However, it would not

meet the other project objectives of optimizing the use of the project site for disposal capacity; increasing the height of the landfill to allow it to continue accepting historic waste volumes; and creating a comprehensive zoning district to bring the landfill and Recyclery into compliance with San Jose's zoning. Further, because the applicants do not own the Kirby Canyon Landfill, the final EIR concluded its feasibility was "unlikely." The presence of similar environmental effects and the low feasibility of expanding a landfill that the applicants do not own provides substantial evidence to support the final EIR's conclusion that the location alternative was infeasible. (See *Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 574 ["[W]hether a property is owned or can reasonably be acquired by the project proponent has a strong bearing on the likelihood of a project's ultimate cost and the chances for an expeditious and 'successful accomplishment.' "].)

Finally, Milpitas takes issue with the discussion in the City Council resolution of the project's consistency with certain San Jose goals, policies, and objectives. Milpitas argues that the final EIR is deficient because it did not consider "whether or not any of the alternatives might also achieve these new objectives." However, after discussing those municipal objectives, the resolution proceeds to discuss each alternative in relation to the final EIR's project objectives and explain why each of those alternatives was infeasible. The City Council's rejection of each alternative was based on the project's objectives as stated in the final EIR rather than any municipal objectives with which the project might have also been consistent, and San Jose's reference to those municipal objectives does not constitute a failure to proceed in the manner required by law. In our view, the site-specific nature of the final EIR's project objectives did not preclude effective alternatives analysis and the City Council's conclusion that none of the alternatives was feasible is supported by substantial evidence.

### III.   DISPOSITION

The judgment is affirmed. Each party to bear its own costs on appeal.

27

_____

Grover, J.

**WE CONCUR:**

_____

Bamattre-Manoukian, Acting P.J.

_____

Mihara, J.